IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-508-BO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| $35,835.00 IN U.S. CURRENCY, ) | |
| Defendant. ) | |
| ) | |
| and ) | |
| ) | |
| AWWAD MOHAMED, ) | |
| Claimant. ) | |

This cause comes before the Court on plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Also before the Court is claimant Awwad Mohamed's motion to suppress. The appropriate responses and replies have been filed, or the time for doing so has expired, and both motions are now ripe for ruling. For the reasons that follow, plaintiff's motion is granted and claimant's motion is denied.

## BACKGROUND

Plaintiff, the government, initiated this *in rem* action to enforce the provisions of 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C). Defendant currency was seized during a traffic stop which occurred on April 22, 2020, in Nash County, North Carolina. Claimant, Mohamed, appeared, has answered the complaint, and filed a claim. The case proceeded through a period of discovery and is now before the Court on the instant motions.

DISCUSSION

I. Motion to suppress

"[E]vidence obtained in violation of the Fourth Amendment must be excluded from a civil forfeiture proceeding." *United States v. Taylor*, 13 F.3d 786, 788 (4th Cir. 1994). Mohamed seeks to suppress as evidence any and all physical objects, pre-detention and post-detention statements, and any and all other physical evidence which was obtained by the government as a result of the stop, interrogation, and detention of Mohamed, all of which Mohamed contends occurred in violation of his Fourth and Fifth Amendment rights. [DE 49]. Mohamed makes two arguments in support of his motion. He argues first that the *in rem* complaint and attached declaration fail to recite facts which would support probable cause to believe that the currency at issue was derived from illegal activities. Mohamed argues second that the detention exceeded to tolerable duration of the mission created by the traffic stop.[1]

The following facts are derived from the evidence filed in support of the government's motion for summary judgment, on which it has also relied in its opposition to the motion to suppress.[2]

On Wednesday, April 22, 2020, at approximately 8:11 a.m., Deputy S. Smith with the Nash County Sheriff's Office conducted a traffic stop on a white minivan[3] with Massachusetts license plates being operated by Mohamed heading south on Interstate 95. PA 14. Deputy Smith had pulled in behind the minivan after recording it travelling 81 mph and a 70 mph zone. *Id.* A second radar

---

[1] Mohamed has requested a hearing but has not requested that the Court conduct an evidentiary hearing. The Court finds that the material facts are not in dispute and it may resolve the motion without a hearing. *See Taylor*, 13 F.3d at 789.
[2] Citations to the government's evidence are to the "Plaintiff's Appendix" or "PA" [DE 58] and page number.
[3] Although the incident report references a van, the uncontested statement of facts in support of summary judgment identifies the vehicle as a Dodge Grand Caravan or minivan.

2

reading showed the minivan going 76 mph and the minivan subsequently moved to the right lane and ultimately exited the highway. *Id.* Deputy Smith believed this was in an attempt to avoid contact with her and she exited the highway at the same exit. *Id.* Deputy Smith then initiated a traffic stop. *Id.*

As she approached the minivan she looked in the dark tinted back windows for her safety and noted that the rear seats were laid down with blankets over them. *Id.* Deputy Smith initiated contact with Mohamed, the driver and sole occupant. *Id.* Mohamed retrieved his license on request and Deputy Smith asked him to exit the minivan and walk back to her patrol car. *Id.* Mohamed put on his shoes and consented to a weapons frisk of his person. PA 15. Deputy Smith asked Mohamed where he was coming from after noting his bulky fuzzy jacket (she was wearing short sleeves) and Mohamed told her he was coming from New York. *Id.*

Deputy Smith asked Mohamed to sit in the front of her patrol car and she advised she would only be issuing a warning ticket. *Id.* While she was writing out the warning ticket, Deputy Smith asked Mohamed where he was heading today, and Mohamed responded he was going to see his cousin. *Id.* Deputy Smith inquired where his cousin was located and Mohamed responded that he thought it was Bishop Road and that his family was having a little gathering at their house. *Id.* Deputy Smith asked Mohamed if anything illegal was in the car to which Mohamed responded "No ma'am" and that he did not want to make her job harder. *Id.* Deputy Smith asked again whether there was anything illegal in the car to which Mohamed again responded that there was nothing illegal in the car. *Id.* During this time, Deputy Smith believed Mohamed, who was breathing heavily with his hands and arms across the front of his body, and was leaning forward and looking straight ahead, was acting abnormally nervous for someone receiving a warning ticket. *Id.* Deputy Smith asked Mohamed whether the vehicle was registered to him and he told her it was

3

a rental, that he would be dropping it off "here to enterprise" and that he would "stay for about two days then go[] back". *Id.*

Deputy Smith called for backup and Mohamed continued to appear nervous. *Id.* Mohamed asked if he could retrieve his cell phone from the minivan and Deputy Smith asked if she could retrieve it for him. *Id.* Deputy Smith asked again whether Mohamed had anything illegal in the car, and Mohamed stated there was not. *Id.* Deputy Smith asked if she could search the minivan and Mohamed responded that he did mind if she searched, noting that she did not have a warrant or a legal reason because he was not really speeding. *Id.* Deputy Smith told Mohamed he was speeding, and he responded that he was five miles over the limit. *Id.*

Deputy Smith called for K-9 unit assistance at 8:16 a.m. *Id.* She then went to the minivan and retrieved the Vehicle Identification Number as well as Mohamed's cell phone from the minivan door. *Id.* While he used his phone, Deputy Smith observed that Mohamed's hands were shaking. *Id.* Deputy Smith continued having a general conversation with Mohamed, asking him his age, how long he had lived in New York, and what he did for a living. *Id.* Mohamed responded that he was twenty-three, had spent most of his life in New York, and that he owned a deli.

After learning that the minivan was not stolen or wanted, Deputy Smith asked Mohamed a series of questions about whether there were any illegal drugs in the car, to each of which Mohamed responded no. PA 16. She then asked whether he possessed a large amount of U.S. Currency over $10,000; Mohamed "licked his lips with a pause and stated very softly no." *Id.* Deputy Smith asked why all of the seats were laid down to which Mohamed responded that he had gotten it like that, it was a rental car, he was alone, and that he was dropping it at Enterprise later that day and would be gone. *Id.*

4

Deputy Smith noted this was inconsistent with Mohamed's prior statement that he would be staying with family for two days and that Mohamed had struggled to identify where Bishop Road was located. *Id*. Mohamed followed up by saying he was going to visit family and showed Deputy Smith his cell phone and the Snapchat message it displayed. *Id*. The messages displayed revealed that Mohammed and the message writer were corresponding about the stop and that the message writer was concerned if Deputy Smith was "regular police." *Id*. Deputy Smith thought this meant Mohamed and the other individual were trying to ascertain whether she was a federal law enforcement officer. *Id*. Mohamed then showed Deputy Smith a message with an address of Sunset Avenue in Rocky Mount, North Carolina and stated that was where he was going. *Id*. Deputy Smith, noting that Bishop Road was "a lot different" from Sunset Avenue, formed the opinion that he was not being truthful about his travel and did not want to tell her where he was really going. *Id*. She asked Mohamed whom he was chatting with and he told her "Omar". *Id*. Deputy Smith continued writing out the warning ticket. *Id*.

Deputy Smith asked Mohamed what time he had left New York and he indicated approximately 10:00 p.m. *Id*. Deputy Smith confirmed using license plate readers that Mohamed was in South Delaware shortly after 12:00 a.m. that morning, driving southbound through Delaware. *Id*. At approximately 8:25 a.m., Deputy Smith called Mohamed's driver's license through dispatch to check for warrants and found no outstanding warrants. *Id*. Deputy Smith asked Mohamed whether a dog would alert on his car for the scent of illegal narcotics and Mohamed responded "it shouldn't". *Id*.

Two other members of the Nash County Sheriff's Office, Lieutenant Sherrod and Deputy Stewart, arrived at that time. *Id*. Deputy Smith asked Deputy Stewart to look in the minivan to get another officer's opinion about the inside of the minivan. *Id*. Deputy Smith advised both Lt.

5

Sherrod and Deputy Stewart that she suspected criminal activity based on the totality of the circumstances and that a K-9 unit was on the way. *Id.* When she returned to her patrol car she noticed Mohamed was recording her on his cellphone. *Id.* She advised him that her patrol car was recording as well; Mohamed asked Deputy Smith if he should stop recording and she said it was fine for him to record. *Id.* Mohamed then began to challenge the speed at which Deputy Smith contends he was going when he was stopped. *Id.* Deputy Smith noticed that Mohamed was continuing to text about his location and Deputy Smith asked him about that. *Id.* Mohamed explained it was a nonchalant conversation about his location, but Deputy Smith was suspicious that he was providing that information so that someone could come to the scene and harm her or others. PA 17. Deputy Smith asked Mohamed if he was "putting a hit out" on them and Mohamed responded "hopefully not." *Id.* Mohamed stated that there was nothing illegal in the car, and Deputy Smith told him that his behavior was making her nervous. *Id.* Mohamed responded that he was only going 76, and Deputy Smith explained that North Carolina is an absolute speed law state and that anything over the posted speed limit is speeding. *Id.*

Deputy Smith told Mohamed that she could not do what she needed to do because he was messaging people their location and it was making her nervous. *Id.* Mohamed responded that it was his first time in North Carolina and his cousin was checking on him, so Mohamed was telling him where he was. *Id.* Deputy Smith was aware that the person Mohamed was messaging was the same person who had previously asked if she was "regular police." *Id.* Deputy Smith then contacted her Captain, who told her to call him about the stop. *Id.* Deputy Smith told Mohamed she had to take a call from her supervisor and stepped out of the patrol car. *Id.* Captain Wilson informed Deputy Smith that he would contact their Drug Enforcement Administration liaison. *Id.*

6

Deputy Smith returned to her patrol car and continued writing out the warning ticket. *Id.* At 8:38 a.m., the K-9 handler and dog arrived at the scene. PA 34. The K-9 was walked around the vehicle twice and alerted on the driver's side rear door. PA 17; PA 34. As she provided Mohamed with his warning ticket at 8:40 a.m., Deputy Smith informed him they would be performing a probable cause search of the minivan. *Id.*

The search began where the K-9 had alerted and the officers found a floor compartment where there were three black plastic bags containing what appeared to be bundled cash. *Id.*; PA 34. They did not discover any luggage, bags, or toiletry items. PA 17. A large, gray, plastic trash bag was recovered from the rear cargo area of the minivan containing ten full cartons of Winston cigarettes with New York State tax stamps on the tops of them. *Id.*

At approximately 9:17 a.m., Nash County Sheriff's Office Lieutenant and Drug Enforcement Administration (DEA) Task Force Officer (TFO) Lewis arrived at the scene. PA 4. At 9:22 a.m. TFO Lewis removed the currency from the natural void in the floor and gave it to Deputy Smith, who placed into a sealed Nash County evidence bag. *Id.* Items were opened and photographed and the cigarette cartons, blankets, and other items were put back in the minivan. PA 17. Mohamed was told that it was suspected that the currency was part of criminal activity and he was asked to follow law enforcement to the Nash County Sheriff's Office for an interview. *Id.* Deputy Smith and Mohamed both left the scene at approximately 9:34 a.m. and arrived at the Sheriff's Office at 9:51 a.m. *Id.* After performing tests on her radar detection device, Deputy Smith activated her body worn camera and removed the U.S. currency from her patrol car, entered the Sheriff's Office, and proceeded to the third floor where she videoed the currency. *Id.* Captain Wilson requested that Deputy Knight take the currency to the first floor where additional K-9 sniff protocols were performed. PA 17-18; PA 34. At approximately 10:45 a.m., the K-9 positively

7

alerted to the odor of narcotics on, around, or from a box containing the currency in a blind line-up. PA 34. Deputy Smith asked Mohamed to sign receipts for an undetermined amount of U.S. Currency, which he did. PA 18.

At 10:03 a.m., TFO Lewis and TFO Lankosz spoke to Mohamed after TFO Lewis informed Mohamed that he was not under arrest and that he was free to leave, but that if he wanted to stay there would be questions about the currency. PA 4. Mohamed stayed and was questioned on the third floor of the Nash County Sheriff's Office. *Id.* Mohamed informed the TFOs that he owns a deli in Bronx, New York and that his annual salary was approximately $70,000. *Id.* Mohamed stated that he had come to North Carolina to buy a gas station and visit Omar, later identified as Omar Naser (Naser). *Id.* Mohamed stated that he and Naser were friends and Mohamed had known Naser for approximately nine months to a year. *Id.* After being asked, Mohamed stated that the amount of currency in his possession was approximately $30,000, and then looked in his cell phone and stated it was $35,835. *Id.* Mohamed stated that he had hidden the money in the floor compartment because he did not want to get robbed while sleeping at a rest area. *Id.* Mohamed stated that the cigarettes in the minivan were purchased by him for personal use and that the currency was not related to cigarettes but was comprised of two bank account withdrawals of $10,000 each and loans from other people. *Id.* Mohamed also stated that the minivan had been rented by his father, that he had left New York the previous night at about 10:00 p.m., and that, due to COVID-19, he was trying to start a business outside of New York. *Id.* Mohamed stated that he and Naser were planning to purchase a business together in North Carolina due to the lower taxes. *Id.*

8

As noted above, Mohamed argues first that the complaint and attached declaration do not amount to more than speculative assertions for the seizure of U.S. Currency.[4] A civil forfeiture complaint must "allege sufficient facts to support a reasonable belief that the property is subject to forfeiture." *United States v. Mondragon*, 313 F.3d 862, 865 (4th Cir. 2002). To the extent Mohamed attacks only the allegations in the complaint, the Court concludes, for the reasons discussed below, that the government has sufficiently alleged facts which support a reasonable belief that the U.S. Currency at issue in this case is subject to forfeiture.

"[C]laimants may [also] challenge the legality of the seizure of the currency, much like a defendant in a criminal case who brings a motion to suppress." *United States v. $78,850.00 in U.S. Currency*, 444 F. Supp. 2d 630, 636 (D.S.C. 2006) (internal quotation and citation omitted). Mohamed contends that his detention during the traffic stop exceeded to tolerable duration of the mission created by the stop. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "The Fourth Amendment generally requires the police to obtain a warrant before conducting a search." *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010). A warrantless search is "per se unreasonable" and violates the Fourth Amendment, unless a well-delineated exception to the warrant requirement applies. *Katz v. United States*, 389 U.S. 347, 357 (1967).

"A traffic stop constitutes a seizure under the Fourth Amendment and thus must be justified by reasonable suspicion of criminal activity or some other exception to the generally applicable warrant requirement." *United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020). Mohamed

---

[4] Mohamed's motion also includes a footnote which states that "Upon information and belief, it appears that since at least 2020, Nash County Law Enforcement has been exclusively targeting minorities for civil forfeiture of money found during roadside stops" and lists several cases. [DE 50 p. 1 n. 1]. Mohamed makes no argument, and in this posture the Court declines to consider the issue.

9

does not challenge the basis for the traffic stop or contend that he was not speeding. Accordingly, Deputy Smith was permitted to detain Mohamed's minivan for "as long as it t[ook] to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). Those activities include checking a driver's license, validating vehicle registration, and running computer checks. *Id.*; *see also United States v. Villavicencio*, 825 F. App'x 88, 96 (4th Cir. 2020). Deputy Smith was further permitted to ask Mohamed to get out of his minivan and wait in her patrol car while she performed her checks and wrote out his ticket. *United States v. Hampton*, 628 F.3d 654, 658 (4th Cir. 2010).

Deputy Smith was also permitted to question Mohamed about matters unrelated to the traffic stop, so long as her questioning did not "extend an otherwise-completed traffic stop". *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015). The same is true for the K-9 sniff. *Id.* But, a traffic stop which exceeds "the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States* 575 U.S. 348, 350 (2015). Reasonable suspicion or consent is required to extend the original traffic stop in order to investigate an independent offense. *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018).

The traffic stop was initiated at 8:12 a.m. Between 8:12 a.m. and 8:16 a.m., Deputy Smith had radioed for backup due to Mohamed's nervous behavior as well the state of the interior of the minivan which had aroused her suspicion. While Deputy Smith continued to write the warning ticket, she asked Mohamed questions and he eventually provided her with an inconsistent statement about how long he was planning to be in North Carolina. She also retrieved his cell phone and took vehicle identification information from the minivan. At 8:25 a.m., Deputy Smith was still engaged in routine activities related to a traffic stop when she radioed dispatch to perform

10

a background check. Deputy Smith then exited her vehicle to provide information to two other law enforcement officers who had arrived on the scene. Over the next approximately ten minutes, Deputy Smith continued to write the warning ticket, engaged in conversation with Mohamed about his filming her and sending location information over text, and responded to his questions about whether or not driving 75 or 76 mph was really speeding. At one point, Deputy Smith informed Mohamed that his nervous behavior, including shaking hands, was making her nervous. She also told Mohamed that she could not finish what she was trying to do because he was asking her questions and making comments as well as sending information about the stop to an unknown recipient which was making her nervous. The K-9 Officer arrived on the scene at 8:38 a.m. and by 8:40 a.m. the sniff had been conducted, the dog had alerted, and Deputy Smith had given Mohamed his warning ticket. All told, the traffic stop was twenty-eight minutes and it took twenty-six minutes for the K-9 unit to arrive.

First, the Court determines that in this case the traffic stop was not unreasonably extended. *Branch*, 537 F.3d at 336 ("The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision."). It was not until after the K-9 arrived that Deputy Smith completed the warning ticket, and during the intervening time she was engaged in verifying Mohammed's identity, checking vehicle information, and writing out the warning ticket. She was also engaged in permissible conversation with Mohamed and responded to his questions and concerns. Finally, Deputy Smith spoke to other law enforcement officers who had arrived and spoke to her Captain on the telephone. Based on the facts of this case, a twenty-six minute stop was not unreasonable. *See United States v. Dorsey*, No. 4:16-cr-00575-RBH, 2017 U.S. Dist. LEXIS 21112, at *11 (D.S.C. Feb. 15, 2017) (listing cases approving detention periods of up to thirty-eight minutes to await a K-9).

Second, the Court determines that, even if the traffic stop was extended or that Deputy Smith "slow walk[ed] or prolong[ed] the stop to allow time for completing a dog sniff," *United States v. Podbielski*, No. 22-4084, 2023 WL 4888866, at *5 (4th Cir. Aug. 1, 2023), Deputy Smith had a reasonable suspicion that criminal activity was afoot sufficient to justify extension of the stop.

Deputy Smith noted her suspicion of criminal activity from the stop's inception. The facts she found to be suspicious were Mohamed's quick exit off the highway after she pulled in behind him but had not yet turned on her lights or siren, the fact that all of the rear seats of the minivan were down and covered with blankets, the lack of visible luggage in the rear area of the minivan despite Mohamed stating he would be staying for a few days, Mohamed's nervousness, including his shaking hands and unusual posture despite the fact that he was receiving a warning ticket, Mohamed's inconsistent statements regarding where he was going and how long he would be staying there, Mohamed's text messages about Deputy Smith being "regular police" and his concerning response when asked whether he was putting a hit out on Deputy Smith, and the change in Mohamed's tone and demeanor when asked if he had more than $10,000 in currency. Deputy Smith further noted that the stop occurred on I-95, a well known drug trafficking corridor. Reviewing this evidence as a whole, the Court finds that Deputy Smith had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) (citation omitted). Accordingly, the Court determines that any extension of the traffic stop was not unreasonable.

A dog sniff of an automobile is not a search under the Fourth Amendment, but an alert by a K-9 drug dog to the presence of narcotics provides probable cause to search the vehicle. *United States v. Branch*, 537 F.3d 328, 335, 340 n.2 (4th Cir. 2008). Mohamed does not specifically

12

challenge any of law enforcement's actions after the K-9 alerted to his vehicle. The motion to suppress is therefore denied.

II. Motion for summary judgment

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. . . . and [a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Claimant has not responded to the motion for summary judgment. The failure of a party to respond to a motion for summary judgment "leave[s] uncontroverted those facts established by the motion". *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). However, "the moving

13

party must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law.'" *Id.*

In addition to factual summary of the traffic stop, the uncontested material facts include the following. [DE 57]. It is consistent with the known practices used by cigarette traffickers to conceal contraband under blankets on top of folded down seats in the rear cargo area of vehicles. PA 10 ¶ 10. It is also not uncommon for cigarette traffickers to use rental vehicles and for the driver of a vehicle to not have been the person who rented the vehicle. *Id.* ¶ 8. In this case, the minivan was rented from an Enterprise Rent-A-Car at the LaGuardia Airport in New York at approximately 6:20 p.m. on April 21, 2020, and was due to be returned by 7:00 p.m. on April 22, 2020. PA 22. New York is a destination state for contraband cigarettes due to its high combined excise tax rate of $58.50 per carton. PA 5 ¶ 15, PA 8 ¶ 3. Payment of New York's combined excise tax rate is evidence by a tax stamp which is affixed to each pack of cigarettes. *Id.*; PA 411. North Carolina imposes a tax rate of $4.50 per carton and does not affix a tax stamp. *Id.* North Carolina is a source state for contraband cigarettes. PA 8 ¶ 3; PA 408.

The round-trip distance between LaGuardia Airport in New York and Rocky Mount, North Carolina is typically between 970 and 1050 miles, depending on route of travel. PA 9 ¶ 7. Between March and April 2020, Mohamed's father rented three other vehicles, two vans and an SUV, from the LaGuardia Airport Enterprise. Each rental was for an approximately twenty-four hour period and the trips incurred mileage of 1,000; 3,783; and 1,027 miles within the twenty-four hour period. Using serial rentals of different vehicles to make different, quick trips between New York and North Carolina is consistent with the known patterns of cigarette traffickers. PA 9-11.

During the traffic stop, Mohamed was messaging Naser, not his cousin as he had told Deputy Smith. PA 99; PA 140. The currency discovered in the minivan was rubber-banded into

14

smaller bundles and wrapped in black plastic bags. PA 3-4; PA 29-30. Cigarette traffickers transport money this way because it is easy to count. PA 145; PA 163. On two occasions in 2019, the deli in Bronx, New York which Mohamed stated that he owned (2958 Day & Night Grocery), was cited by New York authorities for possessing untaxed cigarettes for sale. PA 261-265. Naser was convicted in September 2018 of a violation of New York tax law for possession and transportation of more than 10,000 unstamped cigarettes. PA 416. One of Naser's co-defendants, Abraham Sharhan, was identified as working at 2958 Day & Night Grocery in 2019. PA 415; PA 262.

Naser has testified in a deposition that he began selling cigarettes to Mohamed approximately two months before Mohamed was stopped in the traffic stop at issue in this case. Naser stated that he sold cigarettes to Mohamed about three other times, that Mohamed purchased more than fifty cartons[5] of cigarettes at a time, and that Mohamed paid Naser with cash. Naser and Mohamed engaged in these transactions at a tobacco store on Bishop Road in Rocky Mount, North Carolina. PA 139-44, 147.

Mohamed's debit card was used to make purchases in North Carolina on March 6, 2020, and April 13, 2020. Mohamed's debit card was used at gas stations in Maryland and/or Virginia at locations close to I-95 on March 6, March 7, March 30, and April 13, 2020. PA 941-943; PA 11. These dates overlap with the vehicle rentals by Mohamed's father. Contraband cigarettes are frequently sold for cash in the destination state, such as New York, and then cash proceeds are transported back to the source state, such as North Carolina, to purchase more contraband cigarettes. PA 8-9. A carton of premium brand cigarettes in North Carolina costs approximately $70. PA 12 ¶ 13. At this price, the currency located in Mohamed's minivan would have purchased

---

[5] Fifty cartons of cigarettes would typically contain 10,000 cigarettes, assuming each pack contains twenty cigarettes and each carton contains ten packs. [DE 56 p. 2 n.1].

15

over 500 cartons of cigarettes. *Id.* On April 22, 2020, Mohamed had a prearranged meeting with Naser to purchase more than fifty cartons of cigarettes from Naser at the tobacco store off Bishop Road and they had discussed the quantity and price in advance. PA 140-42; 148. Mohamed's statement that he was coming to North Carolina to purchase a business was "an excuse for the money." PA 148-49. When Mohamed was deposed in this case, he invoked his Fifth Amendment privilege against self-incrimination to every substantive question asked of him. *See, e.g.*, PA 208-09.

Summary judgment is appropriate if the government has demonstrated by a preponderance of the evidence that the defendant property is subject to forfeiture as proceeds of a specified unlawful activity, here trafficking in contraband cigarettes. 18 U.S.C. §§ 981(a)(1)(C), 983(c); 18 U.S.C. § 2342. Contraband cigarettes are "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found[.]" 18 U.S.C. § 2341(a)(2). It is unlawful "to knowingly ship, transport, received, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342(a). "Proceeds from cigarette trafficking are forfeitable." *United States v. $66,015.00 in U.S. Currency*, No. 5:20-CV-00701-M, 2022 WL 19001969, at *4 (E.D.N.C. Nov. 29, 2022). Currency which is obtained, directly or indirectly, from cigarette trafficking constitutes proceeds from cigarette trafficking. *Id.*; *United States v. Hasan*, 718 F.3d 338, 345 (4th Cir. 2013).

To obtain forfeiture, "the Government must show a 'substantial connection between the property and the offense.'" *United States v. McClellan*, 44 F.4th 200, 205 (4th Cir. 2022) (citing 18 U.S.C. § 983(c)(3)). The government need not demonstrate a substantial connection through direct evidence linking the property to a specific unlawful transaction, and the government may use circumstantial evidence to satisfy its burden. *United States v. $84,615 in U.S. Currency*, 379

16

Case 5:20-cv-00508-BO   Document 60   Filed 09/12/23   Page 16 of 19

F.3d 496, 501 (8th Cir. 2004). The government may further rely on evidence gathered after the filing of its forfeiture complaint to demonstrate that the property is subject to forfeiture. 18 U.S.C. § 983(c)(2). Finally, the Court must consider the totality of the evidence, and not consider the evidence in a piecemeal fashion. *United States v. Thomas*, 913 F.2d 1111, 1115 (4th Cir. 1990).

The government has satisfied its burden here. The uncontroverted evidence demonstrates that on April 22, 2020, Mohamed was stopped with a large amount of cash which was rubber-banded and stored in black plastic garbage bags. *Id.* (possession of "unusually large amounts of cash" significant in establishing property is subject to forfeiture). Mohamed also specifically denied having more than $10,000 in currency when asked by Deputy Smith at the traffic stop. Mohamed made inconsistent statements regarding the length of his trip, he travelled with no luggage or toiletries, and his rental car was due to be returned to New York by 7:00 p.m. despite his having left New York the evening before. Despite being the sole occupant, Mohamed was driving a minivan, with the rear seats folded down and blankets in the back. Finally, Mohamed was travelling between New York and North Carolina. North Carolina is a recognized source state for contraband cigarettes and New York is a recognized destination state for contraband cigarettes. *See also* PA 303-310. This was also not Mohamed's first trip between New York and North Carolina nor was it the first time in the preceding weeks that Mohamed's father had rented a minivan or SUV at LaGuardia Airport for a roughly twenty-four-hour period. Bank records place Mohamed along the I-95 corridor between New York and North Carolina during the time periods associated with the car rentals by his father. Mohamed's stated reason for coming to North Carolina, to purchase a business, also appears to have been false. Finally, a K-9 alerted to the currency seized in this case, and the government has provided evidence that "illegal drugs are often connected to cigarette trafficking" PA 9 ¶ 6.

17

Mohamed has not been convicted of cigarette trafficking. However, the individual Mohamed was scheduled to meet in Rocky Mount, Naser, has been convicted of possession and transportation of more than 10,000 unstamped cigarettes. Mohamed's deli in New York has been cited for possession of untaxed cigarettes on two occasions and someone who apparently worked at Mohamed's deli was indicted for cigarette trafficking. Mohamed declined the opportunity to explain his April 22, 2020, trip to Rocky Mount, or any of his other trips, or the source of the subject currency. *See Thomas*, 913 F.2d at 1115 (noting that adverse inferences are permitted in civil actions against parties who exercise Fifth Amendment right in response to questioning) (citation omitted).

Finally, Naser has testified that Mohamed was driving to Rocky Mount in order to purchase cigarettes from Naser. Mohammed was coming to purchase more than fifty cartons of cigarettes, and specifically around 200 cartons. Naser had sold similar quantities of cigarettes to Mohamed on prior occasions. That Mohamed has not been charged with cigarette trafficking is of no moment. *See, e.g., United States v. One Parcel of Real Est. Located at 7715 Betsy Bruce Lane Summerfield, N.C.*, 906 F.2d 110, 111 (4th Cir. 1990).

In sum, the totality of the undisputed evidence, even when viewed in the light most favorable to Mohamed, supports that the government has established by a preponderance of the evidence that the defendant currency is subject to forfeiture as proceeds of trafficking in contraband cigarettes. Though some of the factors discussed above many not in isolation be sufficient to carry the government's burden, the Court must consider each of the factors together. Mohamed has not responded to the motion for summary judgment, and thus has not come forward to demonstrate the existence of a disputed issue of material fact. Thus, the Court determines that summary judgment in favor of the government is warranted.

## CONCLUSION

For the foregoing reasons, claimant's motion to suppress [DE 49] is DENIED and plaintiff's motion for summary judgment [DE 55] is GRANTED. The clerk is DIRECTED to enter judgment in favor of the plaintiff and close this case.

SO ORDERED, this 12 day of September 2023.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE